**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Air Baltic Corporation AS, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 26-12188 (LGB) |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF THE AD HOC GROUP OF 2029 BONDHOLDERS WITH RESPECT TO THE DEBTORS' DIP FINANCING MOTION AND VENDOR MOTION**

The ad hoc group (the "Ad Hoc Group") of holders of a portion of the 14.50% Secured Bonds due 2029 (the "2029 Bonds") issued by Air Baltic Corporation AS by and through its undersigned counsel hereby files this limited objection and reservation of rights (the "Limited Objection") with respect to the (i) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 20] (the "DIP Motion") and the related proposed interim and final orders (respectively, the "Interim DIP Order" and the "Final DIP Order"), and (ii) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Non-U.S. Vendors, Lien Claimants, and 503(b) Claimants; (II) Authorizing the Debtors to Continue Performing Under Related Agreements; (III) Authorizing Non-U.S. Vendors and Lien Claimants to Exercise Their Setoff and Recoupment Rights; and (IV) Granting Related Relief* [Docket No. 11] (the "Vendor Motion" and, together with the DIP Motion, the "Motions") and the related

proposed interim and final orders (respectively, the "Interim Vendor Order" and the "Final Vendor Order" and, together with the Interim DIP Order and Final DIP Order, the "Proposed Orders").[1] In support of this Limited Objection, the Ad Hoc Group respectfully states as follows:

## I. BACKGROUND AND PRELIMINARY STATEMENT

1. On September 14, 2026 (the "Petition Date"), Air Baltic Corporation AS, Air Baltic Training SIA, and Baltijas Kravu Centrs SIA (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

2. The members of the Ad Hoc Group, whose members include Klirmark Capital and which is in the process of being reconstituted following the Debtors filing, are beneficial holders of the 2029 Bonds, which have an aggregate principal amount of €398.2 million and as to which €4.4 million in interest has accrued and remains unpaid as of the Petition Date.

3. The 2029 Bonds and all related obligations are secured by, among other things, liens and security interests on and over surplus proceeds arising from certain aircraft finance leases (collectively, the "Surplus Proceeds Assignments"). Those assignments include rights to surplus value above the applicable finance-lease obligations associated with eight A220-300 aircraft and seven PW1521G spare engines (collectively, the "Financed Equipment"). The Bond Collateral also includes first-priority Latvian law commercial pledges over certain fixed assets, mortgages over real property, pledges of shares in Air Baltic Training SIA and Baltijas Kravu Centrs SIA, assignments of certain receivables, and security over certain trademarks and the bond service reserve account (collectively, with the Surplus Proceeds Assignments, the "Bond Collateral"). The liens and security interests on and in the Bond Collateral (the "2029 Bond Liens")

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motions or the Proposed Orders, as applicable.

are granted to and held by U.S. Bank Trustees Limited, as Notes Security Trustee (the "Security Trustee"),[2] for the benefit of the Security Trustee and holders of the 2029 Bonds (collectively, the "Bondholders").

4. Beginning in the summer of 2026, the Ad Hoc Group engaged (at the request of the Debtors) constructively and in good faith with the Debtors and their advisors in an effort to provide a consensual financing solution that would address the Debtors' liquidity needs while preserving the Bondholders' collateral position. The Ad Hoc Group exchanged multiple term sheets with the Debtors over weeks of arm's-length negotiations. The structure and terms of the Ad Hoc Group's proposed financing was based on the Debtors' proposed financing requirements, the structure and timing of their wider restructuring, and short term cash flow forecast. Information provided to the Ad Hoc Group in relation to these items appear to be at odds with information the Debtors' have subsequently disclosed as part of their filing in relation to the Debtors' liquidity forecast, timing for the agreement, and implementation of the wider restructuring and treatment of bondholders.

5. In a show of good faith, the Ad Hoc Group supported Bondholder consent resolutions at an August 17, 2026, meeting, which converted the August and November 2026 cash coupons to payment-in-kind and waived the minimum liquidity covenant under the 2029 Bonds. These were significant concessions that provided the Debtors with critical breathing room at a time of severe liquidity pressure and were given on the basis of disclosures made by the Company that it would be pursing an out-of-court consensual restructuring and that Bondholders would be given the opportunity to participate in interim financing to support the restructuring. The Ad Hoc Group understood these concessions to be part of a path toward a negotiated financing solution and were

[2] The Ad Hoc Group is informed that the Security Trustee (and indenture trustee for the Bonds) are seeking, but have not yet secured, representation in these Chapter 11 Cases by U.S. Counsel.

granted despite at that time the Debtors had made payments under an unsecured loan to their majority shareholder, the Latvian government.

6. As late as September 3, 2026, the Debtors called a Bondholder meeting and solicited consents on the Ad Hoc Group's out-of-court financing proposal—representing to the market that the Ad Hoc Group's proposal was the financing solution under active pursuit. The Ad Hoc Group and the broader Bondholder community had every reason to believe that a consensual transaction was imminent. The Ad Hoc Group is informed that this resolution received the overwhelming support of Bondholders (94% of those voting including the Latvian government). Eight days later, on September 12, 2026, the Debtors abruptly signed a commitment letter with an entirely different group of third-party lenders—Barclays, Hayfin Capital Management, Morgan Stanley, Oaktree Capital, and Strategic Value Partners, LLC (collectively, the "DIP Lenders")—and filed these Chapter 11 Cases two days after that, on September 14, 2026. The Debtors' assert in the DIP Motion that the parallel DIP solicitation process with third-party lenders began in August 2026, meaning that the Debtors were conducting a shadow marketing process at the very time they were soliciting Bondholder consents on the Ad Hoc Group's proposal and representing to the Ad Hoc Group that negotiations were ongoing.

7. The Ad Hoc Group was not invited to participate in the DIP financing process on equal terms with the third-party DIP Lenders. The dollar-for-dollar reduction provisions in Tranches 2 and 3—which reduce available financing by any amount provided by a non-DIP Lender party—and other significant features of the DIP financing appear to be designed to foreclose the Ad Hoc Group, or any other party, from providing competing or supplemental financing. The DIP marketing process, as described in the DIP Motion (¶¶ 7, 28–31) and further detailed in the Krastev Declaration (¶¶ 18–19, 24), was not a bona fide effort to obtain the best available financing for the estates on behalf of all stakeholders. Rather, it was structured to exclude

the Debtors' largest secured creditor group—whose collateral is now being used to support the very DIP Facility from which they were excluded. Advisors to the Ad Hoc Group and their financing partners repeatedly assured advisors to the Debtors that the Ad Hoc Group would be prepared to support the Debtors in the event their found it necessary to file for bankruptcy protection and wanted to avoid any dispute as they were aware this could be detrimental to the Debtors' operations. It is therefore, unclear why the Debtors decided to exclude the Ad Hoc Group from the marketing process (or its contingency planning in general), particularly as the Ad Hoc Group's fully committed financing proposal was very similar to the DIP subject to this motion. The Court should carefully scrutinize the Debtors' representations about the adequacy and good faith of the marketing process, particularly in light of the compressed timeline, the parallel solicitation of bondholder consents, and the exclusionary structure of the DIP Facility.

8. The Debtors, by the DIP Motion, are seeking approval of a €350 million ($406 million) superpriority senior secured term loan facility (the "DIP Facility") from the DIP Lenders. The DIP Facility is structured in three tranches: Tranche 1 of €175 million ($203 million), described as nominally non-priming, and Tranches 2 and 3 of €125 million and €50 million, respectively, which are conditioned on an order authorizing priming of the 2029 Bond Liens. Tranche 1 is to be made available in two sub-tranches, with €140 million available upon entry of the Interim DIP Order and the balance available upon entry of the Final DIP Order (Interim DIP Order ¶ 2(a)(i)). Pursuant to the DIP Motion, the Debtors and DIP Lenders are not seeking to prime the 2029 Bond Liens on the Bond Collateral pursuant to the Interim DIP Order, but do intend to prime the 2029 Bond Liens pursuant to the Final DIP Order. Tranche 1, however, is not economically or functionally separable from the priming contemplated by Tranches 2 and 3. Tranche 1 proceeds will be used to repay approximately €71.7 million (plus accrued interest, fees, make-whole amounts, and EDC simulator debt) of EDC- and Axiom-financed debt and grant the

DIP Lenders first-priority liens on the aircraft and engines released from that debt (Interim DIP Order ¶ 5). Once the Debtors use Tranche 1 to transfer that collateral to the DIP Lenders, the Debtors will be dependent on Tranches 2 and 3 for their remaining liquidity, enabling the DIP Lenders to effectively compel priming because the only alternative may be liquidation. The Court should therefore scrutinize the structure of the entire DIP Facility under section 364(d), rather than considering the Tranches 2 and 3 components in isolation. To the extent that the Debtors and DIP Lenders do seek to prime the 2029 Bond Liens pursuant to either the Interim DIP Order or Final DIP Order, section 364(d) of the Bankruptcy Code requires that the Debtors demonstrate that they could not obtain financing on any less onerous terms and that the Security Trustee, Ad Hoc Group, and other Bondholders are adequately protected. The Debtors have not satisfied their evidentiary burden. Moreover, the DIP Facility's fee structure—under which approximately €35 million in commitment fees accrued upon signing of the DIP Commitment Letter, before any court approval or funding—creates a substantial financial barrier to any replacement DIP financing proposal, further entrenching the DIP Lenders' position. See Section II.C, infra.

9. In addition, the Debtors have filed the Vendor Motion, which seeks authority to pay prepetition claims of certain vendors in an amount estimated at approximately $52 million for non-U.S. vendors and $101.7 million for outside maintenance providers, among other amounts. The Ad Hoc Group is concerned that such payments, funded with DIP proceeds secured by, among other things, priming liens on the Bond Collateral upon entry of the Final DIP Order, will significantly diminish the value of the collateral securing the 2029 Bonds without providing adequate protection to the Ad Hoc Group as required by the Bankruptcy Code. *The DIP Motion contemplates that any adequate protection for priming under the Final DIP Order will be addressed at the final hearing, but that proposal does not protect against diminution occurring during the Tranche 1 period or from interim payments under the Vendor Motion. The Proposed*

*Orders should not authorize any use of DIP proceeds that impairs the Bond Collateral, in contravention of the terms of the Bonds, without contemporaneous adequate protection for the resulting diminution.*

## II. LIMITED OBJECTION

10. Section 364 of the Bankruptcy Code permits a debtor to obtain postpetition financing only if such financing is "fair, reasonable, and adequate given the circumstances of the debtor-borrower and the proposed lender." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 767 (Bankr. S.D.N.Y. 2020) (citing *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016)); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Courts reject proposed postpetition financing schemes that would (i) tilt the conduct of the bankruptcy case; (ii) prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or (iii) leverage the chapter 11 process by preventing motions by parties-in-interest from being decided on their merits. *See Ames,* 115 B.R. at 37. The terms of a postpetition financing must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of a particular, favored group of creditors. *Id*. at 40.

11. Further, section 364(d)(1) of the Bankruptcy Code requires the debtor to affirmatively demonstrate that less onerous postpetition financing was unavailable. 11 U.S.C. § 364(d)(1)(A); see also *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992). Although a debtor need not contact every conceivable lender, courts require a real, record-based effort to obtain credit without priming before section 364(d)(1) relief may be granted. *Republic Airways*, 2016 WL 2616717 at *11. Any deference to a debtor's business judgment is not absolute; the Court must still determine whether the statutory predicates of section

364 have been met and whether the proposed terms are fair, reasonable, and necessary under the circumstances. *Ames*, 115 B.R. at 37-40; *LATAM Airlines*, 620 B.R. at 767-69.

**A. Applicable Legal Standards.**

12. As described above, the Ad Hoc Group holds the 2029 Bonds secured by the Bond Collateral, including the Surplus Proceeds Assignments. If the DIP Facility is approved on a priming basis, whether under the Interim DIP Order or Final DIP Order, pursuant to section 364(d), the Security Trustee, Ad Hoc Group, and other Bondholders are entitled to adequate protection of their interests in the Bond Collateral, including, without limitation, through the granting of replacement liens, granting of liens on unencumbered assets, periodic payments of principal, periodic payments of interest, payment of professional fees, or such other protections as are sufficient to ensure that the Ad Hoc Group's collateral position is not diminished. *See* 11 U.S.C. §§ 361, 364(d)(1)(B); *In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary – it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity.") The DIP Motion and DIP Term Sheet make clear that the Debtors "may provide (but shall not be obligated hereunder to so provide)" reasonable postpetition fees and expenses of counsel to the trustee and current cash payments of postpetition interest, subject to minimum-liquidity thresholds and only after Tranche 2 is borrowed (*see also* Interim DIP Order ¶¶ 7–8). Those discretionary and contingent payments cannot be treated as adequate protection for the immediate diminution described above. The proposed adequate-protection package is also inadequate because it provides no adequate protection during the Tranche 1 period on the eight A220-300 aircraft and seven PW1521G engines freed from the applicable finance leases, assets that the DIP Motion confirms contain approximately €170 million of equity value (DIP Motion ¶ 55; Interim DIP Order, Finding J), with additional evidentiary support in the Krastev Declaration (¶ 10). The record also contains no basis

for the Debtors to assert that there is an equity cushion that provides adequate protection: the Debtors' First Day Declaration reports approximately $1.8 billion in total assets against approximately $2 billion in total liabilities, suggesting negative equity and underscoring the need for valuation evidence. Moreover, characterizing current cash interest as adequate protection is misleading because the Bondholders previously consented to payment-in-kind treatment of the August and November 2026 coupons; restoring cash interest merely reinstates a right that was voluntarily deferred and does not provide new value.

**B. Adequate Protection Is Illusory.**

13. The proposed adequate-protection package is illusory and cannot satisfy section 364(d)(1)(B). The DIP Term Sheet makes clear that the Debtors are under no obligation to provide adequate protection payments: subject to maintaining unrestricted cash of at least €10 million after funding Tranche 1 and before funding Tranche 2, and €20 million after funding Tranche 2, the Debtors "may provide (but shall not be obligated hereunder to so provide)" trustee counsel fees and current cash interest. The payments therefore are both discretionary and conditioned on liquidity thresholds that may not be met (*see also* Interim DIP Order ¶ 8).

14. The Adequate Protection Liens are equally illusory during the entire Tranche 1 period. The DIP Term Sheet provides that those liens are junior and silent, subordinate to the DIP Liens, and do not become effective until the date on which any Tranche 2 DIP Loans are funded (Interim DIP Order ¶ 7). Thus, while Tranche 1 is being funded and the Finance Lease Collateral is being transferred to the DIP Lenders, the Bondholders receive no adequate-protection lien at all*. **Leaving aside the fact that the "adequate protection" package is not sufficient to adequately protect the Bondholders' interests, the package is discretionary, liquidity-conditioned, and delayed until Tranche 2 and thus cannot satisfy section 364(d)(1)(B).***

## C. Tranche 1 Is Effectively Priming and the Fee Structure Compounds the Harm.

15. Nor can Tranche 1 be treated as truly non-priming without further scrutiny. The 2029 Bonds are secured by a first-ranking Latvian law governing commercial pledge over a substantial portion of the Company's assets (DIP Motion ¶ 16; Krastev Declaration ¶ 10), while the Tranche 1 DIP Collateral includes seven PW1521G-3 spare engines and the Company's claimed "unencumbered property." The DIP Motion's Schedule 3(b) separately lists the "Spare Parts Pool"—A220-300 rotable and expendable spare parts inventory—and "BSRA / Other"—including the Bond Service Reserve Account balance and other existing 2029 bond collateral (Interim DIP Order, Ex. A, Schedule 3(b)). Once the EDC mortgages on the engines are released using DIP proceeds, those high-value fixed assets held by Air Baltic Corporation AS likely fall within the broader Latvian commercial pledge securing the 2029 Bonds, in addition to the separate spare-parts inventory already identified as Bond Collateral. The engines therefore are Bondholder collateral by operation of the commercial pledge, not merely spare-parts inventory, reinforcing the argument that Tranche 1 effects a de facto priming. The scope of the Bond Collateral and claimed "unencumbered property" is contested and should be determined on an evidentiary record before interim relief is granted.

16. The DIP Motion's text confirms that Tranche 1 is not non-priming as to the Aircraft Collateral. The pre-Priming Order proviso states that the general rule excluding assets securing the Prepetition Bonds from pre-Priming Order priming liens "does not apply in any way to the Aircraft Collateral." (Interim DIP Order ¶ 2(b)(iii); DIP Term Sheet, "DIP Collateral" definition) The DIP Term Sheet defines "Aircraft Collateral" to include the eight Airbus A220-300 aircraft and seven PW1521G-3 spare engines listed on Schedule 3(a), and provides for priming first-priority DIP Liens on that property after the associated finance leases are repaid. ***Thus, the DIP Lenders receive will receive first-priority priming liens on the Aircraft Collateral during***

***the Tranche 1 period, before entry of any Priming Order, contradicting the Debtors' representation that Tranche 1 is non-priming and confirming that the initial tranche effects a de facto priming of the Bondholders' interests without the Bondholders receiving adequate protection.***

17. The fee structure compounds that harm. The DIP Term Sheet imposes a 5% "Backstop Commitment Fee," earned upon commitment; a 5% "Upfront DIP Fee," also earned upon commitment; a 5% "Exit Fee"; and a "Make Whole Fee" covering the interest and fees that would have accrued through maturity if the DIP Facility is prepaid (Interim DIP Order ¶ 2(a)(viii), (e)). The two commitment-earned fees are calculated on the full €350 million commitment, so each is approximately €17.5 million and the two together approximate €35 million; the Exit Fee adds approximately €17.5 million more. All fees are payable in kind, inflating the DIP claim and further eroding recoveries available to the Bondholders. The Court should test these fees and the interest rate against market benchmarks and consider them together with the collateral and process terms in determining whether the DIP Facility is fair, reasonable, and necessary under LATAM and Ames.

18. The timing of those fees also creates a substantial barrier to a replacement DIP. Under Schedule 1 to the DIP Term Sheet, both the Backstop Commitment Fee and Upfront DIP Fee are earned upon commitment. Because the DIP Commitment Letter was executed on September 12, 2026, approximately €35 million accrued at signing—before court approval and before any funds were advanced. Those sunk costs, together with the Make Whole Fee, mean that any competing lender would need to fund the buyout of the accrued fees while providing new liquidity. That is an improvident exercise of the Debtors' business judgment. The Debtors' own record makes the problem acute: the DIP Motion states that the Debtors "conducted a competitive marketing process for DIP financing and received term sheets from three potential financing

parties," entered confidentiality agreements with "ten additional parties," and "leveraged the interest in providing DIP financing to achieve improved terms" (DIP Motion ¶ 7). The Krastev Declaration adds that SVP "carried out a syndication process for additional lenders" and that "[o]ther financing parties also demonstrated interest in partnering with SVP" (Krastev Declaration ¶¶ 18–19, 24). If there was indeed such keen interest in providing DIP financing, a fee structure that locks in massive costs upon commitment is improvident because it forecloses the very competition the Debtors claim existed. ***The Court should not sanction fee provisions that slam the door on alternative financing proposals before the final hearing, particularly where the Debtors' own record shows that other suitors exist who may offer superior terms.***

### D. The DIP Structure Impairs Surplus Proceeds Assignments and Prematurely Transfers Collateral Value.

19. The proposed DIP structure would materially impair the Surplus Proceeds Assignments. The DIP Motion asserts that the Financed Equipment contains substantial equity value and that Tranche 1 proceeds would be used to exercise the purchase options and repay approximately €71.7 million, plus accrued interest, fees, make-whole amounts, and EDC simulator debt, of EDC- and Axiom-financed debt. The Debtors would then grant first-priority DIP liens on the released aircraft and engines, transferring that value from the Bondholders' collateral universe to the DIP Lenders (Interim DIP Order ¶ 5) (and breach the Debtors' obligation to grant Bondholders first lien collateral over the aircraft and engines once acquired by the Debtors). This would, in practical effect, extinguish or bypass the economic value of the Surplus Proceeds Assignments without the consent of, or adequate protection for, the Bondholders. Any interim relief should therefore preserve the Security Trustee's and the Bondholders' interests in the surplus value of the Financed Equipment, including through replacement liens on that equipment or its

proceeds. According to a press release of the Debtors from August 11, 2026, the Bondholders' interest in aircraft and engine collateral has an appraised value of approximately €255 million.[3]

20. The Debtors have not demonstrated that exercising the purchase options on the Financed Equipment is necessary at the outset of these Chapter 11 Cases. The DIP Motion states that the Finance Leases remain in place and that the proposed facility would use Tranche 1 proceeds to acquire title to the aircraft and engines; the Krastev Declaration confirms that the facility matures on the earlier of nine months after the Petition Date and 250 days after Tranche 1 closes. The aircraft and engines are operational, affording time to evaluate whether and when exercising the purchase options would maximize value for the estates as a whole rather than merely for the DIP Lenders. Immediate exercise upon entry of the Interim DIP Order would be premature and would irreversibly transfer in excess of €250 million of surplus equity value from the Bondholders' security package to the DIP Lenders before the Court conducts the full evidentiary hearing contemplated by the Final DIP Order. ***The Interim DIP Order should therefore prohibit the exercise of any Finance Lease purchase options or the repayment of any Finance Lease obligations from DIP proceeds until entry of the Final DIP Order, at the earliest.***

**E. <u>Overreaching DIP Provisions.</u>**

21. The Interim DIP Order's non-interference provision is overbroad. It bars any Prepetition Creditor, including the Security Trustee and Bondholders, from taking or failing to take any action that would "impede, interfere with, delay or prevent" the DIP transactions,

---

[3] https://www.bing.com/ck/a?!&&p=71c91a9143315ed11b2fd9b9dc18627c43203d4af339d99cc7973be3728c1fddJmltdHM9MTc4OTQzMDQwMA&ptn=3&ver=2&hsh=4&fclid=37e969e8-5079-6a9e-0837-7fa451116bb5&psq=airbaltic+euronext+11+august&u=a1aHR0cHM6Ly9kaXJlY3QuZXVyb25leHQuY29tL2FwaS9QdWJsaWNBbm5vdW5jZW1lbnRzL1JJU0RvY3VtZW50L0FOTjE1NjQ5NC5wZGY_aWQ9MTRkYzc0NjEtYWE5Yy00MTM0LTgwYjYtOTg5OTU2N2JlOGI4

including repayment and satisfaction of the EDC/Axiom Finance Lease Obligations and the substantially concurrent collateralization of the Finance Lease Collateral in favor of the DIP Secured Parties (Interim DIP Order ¶ 14(g)). That language could improperly preclude the Ad Hoc Group from challenging the proposed transfer of the Finance Lease Collateral and related priming at the Final DIP Order hearing. The provision should be narrowed to preserve the Ad Hoc Group's right to raise legitimate objections, seek evidence, and contest the collateral transfer and its consequences.

22. The Interim DIP Order grants the DIP Agent, at the direction of the Majority DIP Lenders, an unqualified right to credit bid all or any portion of the then-outstanding DIP Obligations in connection with a sale of any Loan Party's assets under section 363 or section 1129 of the Bankruptcy Code. *See* Interim DIP Order ¶ 14(m). The DIP Term Sheet's "Other Bankruptcy Matters" provision likewise grants the DIP Collateral Agent, subject to entry of the Interim Order, the right to credit bid all or any portion of the outstanding DIP Obligations in connection with any non-ordinary-course sale of the Debtors' assets under section 363 of the Bankruptcy Code, a plan, or otherwise. Thus, unlike the section 506(c), marshaling, and section 552(b) waivers, which are expressly subject to entry of the Final Order, the credit-bid right is a live right upon entry of the Interim Order. The Interim DIP Order also makes the Bondholders' adequate-protection liens junior and silent and gives the DIP Lenders control of the right to credit bid DIP Collateral and any portion subject to those liens. This immediate control over any sale process gives the DIP Lenders effective control over the disposition of estate assets and further diminishes potential recoveries of Bondholders. The Court should not approve or permit exercise of the credit-bid right without preserving the Ad Hoc Group's ability to challenge its scope and effect at the Final DIP Order hearing.

F. **The Vendor Motion Is Overbroad.**

23. The Vendor Motion is excessive in scope and should be substantially reduced on an interim basis. It seeks authority to pay an aggregate of approximately $200 million in prepetition claims, including approximately $52 million to Non-U.S. Vendors, approximately $101.7 million to Outside Maintenance & Service Providers and other Lien Claimants, and approximately $46.6 million in section 503(b)(9) claims. Even on an interim basis, the proposed Interim Vendor Order authorizes payments of up to $45.2 million—a substantial sum to be paid from DIP proceeds on the first day of these cases, before any creditors' committee has been appointed and before the Ad Hoc Group has had a meaningful opportunity to review the Debtors' vendor relationships and payment priorities. The Debtors have not demonstrated that the full scope of payments sought under the Vendor Motion is necessary to avoid immediate and irreparable harm as required by Bankruptcy Rule 6003. The Vendor Motion is overbroad because it sweeps in categories of vendors and service providers whose prepetition claims may not be immediately critical to ongoing flight operations. The Court should exercise caution in authorizing payments of this magnitude at the outset of the cases, particularly where the payments will be funded with DIP proceeds that carry priming liens or superpriority claims that will further diminish recoveries available to the Bondholders. The Ad Hoc Group requests that the Court reduce the Interim Cap under the Vendor Motion or, at a minimum, require the Debtors to provide itemized support for each category of payment and demonstrate on a vendor-by-vendor basis that immediate payment is necessary to avoid irreparable harm to the estates.

24. The Ad Hoc Group is also concerned that DIP proceeds are being used to fund payments under the Vendor Motion, which seeks authority to pay prepetition claims of vendors, lessors, and maintenance providers on a priority basis. To the extent such payments are funded from proceeds of a DIP facility secured by priming liens on the Bond Collateral, the Ad

Hoc Group's collateral would be diminished. The orders approving the Vendor Motion should therefore ensure that any use of DIP proceeds to satisfy prepetition vendor claims does not impair the Ad Hoc Group's collateral or, if it does, that the Ad Hoc Group receives adequate protection for such diminution.

## G. Due Process Inadequacy

25. The Ad Hoc Group files this Limited Objection on extremely short notice to prevent prejudice from interim relief under either the Interim DIP Order or the Interim Vendor Order. The DIP Motion's docket entry reflects "Entered 09/14/26 19:18:18," meaning that it was posted to the Court's docket at approximately 7:18 p.m. Eastern time on Monday, September 14, while the hearing was scheduled for first thing the following morning, Tuesday, September 15, at 8:00 a.m. Eastern time. Most, if not all, of the Debtors' creditors, including the bondholders, are located in Europe—particularly Latvia and the European Union—where that filing time was approximately 2:18 a.m. local time. European creditors therefore had to coordinate with U.S. bankruptcy counsel on an emergency basis, with the filing arriving in the middle of the night.

26. That compressed timeline deprived European creditors, including members of the Ad Hoc Group, of any meaningful opportunity to review and consider the 181-page DIP Motion, its exhibits, the DIP Term Sheet, and the related Proposed Orders before the hearing. It also raises serious due-process concerns in a case involving a foreign debtor whose stakeholders are overwhelmingly located abroad. The DIP documents require entry of the Interim DIP Order within five (5) calendar days after the Petition Date and the Final DIP Order within thirty-five (35) calendar days after the Petition Date (DIP Term Sheet, Schedule 4; Interim DIP Order ¶ 17). If any interim relief prejudices the Ad Hoc Group, it reserves the right to argue that notice was inadequate, but hereby requests that the Court defer consideration of the interim relief requested herein for a few days to allow proper consideration of the relief requested herein.

## III. RESERVATION OF RIGHTS

27. The Ad Hoc Group reserves the right to raise additional objections to the DIP Motion, Vendor Motion, Proposed Orders, and all other first-day relief, and to present evidence at the interim hearing and any subsequent hearing. The Ad Hoc Group further reserves the right to present evidence and raise additional objections at subsequent hearings regarding: (i) the adequacy of the DIP marketing process, including whether less onerous financing alternatives were available; (ii) the amount of DIP financing actually required by the Debtors; (iii) the sufficiency of any adequate-protection package offered to the Security Trustee, Ad Hoc Group, and other Bondholders at the interim and final stages; (iv) the valuation of the Bond Collateral, including the Surplus Proceeds Assignments and the Financed Equipment; (v) the reasonableness of the DIP Facility's fees and economic terms; (vi) whether the dollar-for-dollar reduction in Tranches 2 and 3 for financing provided by non-DIP Lender parties improperly restricts competing financing proposals, including proposals from the Ad Hoc Group; (vii) whether the DIP Facility or Vendor Motion improperly leverages the chapter 11 process to the detriment of the Bondholders; (viii) whether the Debtors' chapter 11 cases were filed in good faith; (ix) whether venue, jurisdiction, comity, or eligibility—including whether any Debtor is a "governmental unit"—requires dismissal or abstention; (x) any other issue bearing on priming, adequate protection, fee reasonableness, the DIP marketing process, or good faith; and (xi) any other matter properly raised before this Court. These issues should not be resolved through interim relief without a developed evidentiary record.

28. The Ad Hoc Group further reserves the right to move to dismiss these Chapter 11 Cases for cause under section 1112(b) of the Bankruptcy Code or, alternatively, to request abstention under section 305(a). Air Baltic Corporation AS is approximately 88% owned by the Latvian Ministry of Transport, and the Latvian government has played a central role in the

Debtors' financial and strategic decision-making, including selection of the DIP Lenders over the Ad Hoc Group's competing proposal. The filing occurred on the eve of Latvian parliamentary elections, after sustained government intervention that included approximately €340 million in equity injections and a €30 million emergency bridge loan. The totality of the circumstances—including the Debtors' minimal nexus to the United States, the location of substantially all assets and operations in Latvia and the European Union, and the government's controlling influence over the restructuring strategy—supports the reserved arguments for dismissal for cause or abstention in favor of a jurisdiction with a more substantial connection to the Debtors and their creditors. Nothing in the Ad Hoc Group's participation in the first-day proceedings or in this Limited Objection waives any foregoing right or constitutes consent to jurisdiction for any purpose other than the relief expressly sought herein.

## IV. CONCLUSION

29. For the reasons stated above, the Court should not grant the Interim DIP Order, Interim Vendor Order, or any "first day" relief to the extent the value of the Bond Collateral is diminished without providing the Security Trustee, Ad Hoc Group, and other Bondholders with adequate protection. At a minimum, any interim relief should be conditioned on: (i) the Debtors providing replacement liens on the Financed Equipment or its proceeds to the Security Trustee for the benefit of the Bondholders; (ii) the Debtors providing an equity cushion or valuation analysis before entry of the Final DIP Order; (iii) an express reservation of the Ad Hoc Group's right to present evidence at the Final DIP Order hearing on all issues, including priming, adequate protection, fee reasonableness, the DIP marketing process, and good faith; (iv) a provision in the Interim DIP Order stating that nothing therein constitutes a finding that the 2029 Bond Liens have been primed or that adequate protection for priming has been established; (v) a prohibition in the

Interim DIP Order on exercising any Finance Lease purchase options or repaying Finance Lease obligations from DIP proceeds until entry of the Final DIP Order (cf. Interim DIP Order ¶ 5); (vi) narrowing the non-interference provision to preserve the Ad Hoc Group's right to raise objections, seek discovery, and contest the Finance Lease Collateral transfer (cf. Interim DIP Order ¶ 14(g)); (vii) limiting the credit-bid right pending the Final DIP Order hearing (cf. Interim DIP Order ¶ 14(m)); (viii) reducing the Interim Vendor Order cap or requiring vendor-by-vendor justification for any immediate payment; (ix) subjecting DIP fee provisions that accrue upon commitment to Court review at the final hearing, with the Court reserving the right to disallow any fee found unreasonable; and (x) providing that the section 506(c), marshaling, and section 552(b) waivers do not take effect until entry of the Final DIP Order after a full evidentiary hearing (cf. Interim DIP Order ¶¶ K, 14(f), 16).

Dated: September 15, 2026
New York, New York

HOGAN LOVELLS CADWALADER US LLP
By: */s/ David P. Simonds*
David P. Simonds
Christopher R. Bryant
Raymond M. Navaro
390 Madison Avenue
New York, NY 10017
Tel: 212-918-3000
Email: david.simonds@hlc.com
christopher.bryant@hlc.com
raymond.navaro@hlc.com

*Counsel for the Ad Hoc Group of 2029 Bondholders*

**Certificate of Service**

I certify that on September 15, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of New York.

By: *David P. Simonds* ____________________________
Name: David P. Simons